UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 25-cv-60315

GENIE-S INTERNATIONAL LTD.,

    Plaintiff,

v.

THE INDIVIDUALS, CORPORATIONS, LIMITED
LIABILITY COMPANIES, PARTNERSHIPS, AND
UNINCORPORATED ASSOCIATIONS IDENTIFIED
ON SCHEDULE A,

    Defendants.
_____/

## DECLARATION OF PAMELA HUI

I, Pamela Hui, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I make this declaration in support of Plaintiff's *Ex-Parte* Motion for Entry of a Temporary Restraining Order ("Motion for TRO"), including temporary restraints and other relief.

3. I am the Director for GENIE-S INTERNATIONAL LTD. ("GENIE-S") and am knowledgeable about or have access to business records concerning key aspects of GENIE-S' brand protection operation, including, but not limited to trademarks, patents, and other intellectual property, sales, online sales, advertising, marketing, media coverage, and associated international operations. I make this declaration from matters within my own knowledge unless stated otherwise.

4. GENIE-S is a limited company organized under the laws of Hong Kong and has its principal place of business in Hong Kong.

5. GENIE-S has been granted licenses and rights to enforce several U.S. Patents covered by at least U.S. Patent Nos. 8,079,388 B2 and 8,881,775 B2 (the "Beauty Union Global Limited Utility Patents") and 9,738,437 B2, 8,978,938 B2, and 9,522,403 B2 (the "Dongguan Yixin Magnetic Disk Co. Ltd Utility Patents") (collectively the "GENIE-S Patents").[1] The GENIE-S Patents are valid, subsisting, and in full force and effect. True and correct copies of the federal patent registration certificates for the GENIE-S Patents are attached as **Exhibit 1**.

6. Plaintiff is a leading supplier and manufacturer of the innovative GENIE-S products such as TRAVALO and Perfume Pod, which encompass proprietary technology claimed in at least a portion of the GENIE-S Patents, and has earned an international reputation for quality, reliability, and value. Plaintiff is credited for many breakthroughs that have occurred in the industry, including its GENIE-S products, and has won many prestigious awards in relation to the GENIE-S Products, including the Watsons HWB Awards, Beauty Challenger Awards, Buyer's Forum: Frontier Mediazone's Most Valuable Services Awards in Hong Kong, and Red Dot Award. The GENIE-S products are sold worldwide via e-commerce websites but are sold primarily in the United States, Europe, Korea, Japan, Taiwan, Russia, Argentina, and Mainland China. GENIE-S has also permitted certain licensees including, PUIG, Parfums Christian Dior S.A., Sephora, and A.S. Watson, to distribute and sell its products.

7. GENIE-S has expended substantial time, money, and other resources in advertising and otherwise promoting the GENIE-S Products, which utilize the technology of and inventions claimed in the GENIE-S Patents. GENIE-S' promotional efforts for the GENIE-S Products include, by way of example but not limitation, advertising campaigns handled by its licensed

---

[1] Beauty Union Global Limited and Dongguan Yixin Magnetic Disk Co. Ltd have authorized Genie-S' use of all IP rights in and to the patents.

2

distributors, social media, beauty magazines, and trade shows, in particular Cosmoprof, Paris Packaging Week, and BeautyWorld. As a result, products utilizing the technology of and inventions claimed in the GENIE-S Patents are widely recognized and exclusively associated by consumers, the public, and the trade as being products sourced from GENIE-S.

8. The success of the GENIE-S Products has resulted in their significant infringement. Consequently, GENIE-S has implemented an anti-infringement program and is investigating suspicious websites and online marketplace listings identified in pro-active Internet sweeps as part of that program. GENIE-S has identified numerous domain names linked to fully interactive websites and marketplace listings on platforms including but not limited to Alibaba, AliExpress, Amazon, Ebay, Shein, Temu, and Walmart (the "Marketplace Platforms").

9. Through GENIE-S' investigation, we have learned of Defendants' sale of products on at least the Marketplace Platforms that appear to be genuine GENIE-S Products, but which are actually inferior and unauthorized imitations of the GENIE-S Products (the "Infringing Products"). Indeed, the Infringing Products utilize the technology of and inventions claimed in the GENIE-S Patents.

10. The Defendants' online marketplace pages on the Marketplace Platforms, identified on Schedule A to the Motion for TRO ("Defendant Internet Stores"), share unique identifiers, such as design elements and similarities of the Infringing Products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences.

11. Despite GENIE-S' enforcement efforts online, Defendants have persisted in creating the Defendant Internet Stores and engaging in continued sales of the Infringing Products.

12. For example, to date, GENIE-S' investigation of Defendants reveals that

Defendants are using the Defendant Internet Stores to sell Infringing Products both domestically and from foreign countries such as China (and elsewhere) to consumers in the U.S., including consumers in Florida.

13. I have directly (or someone working under my supervision has) analyzed each of the Defendant Internet Stores and determined that the Infringing Products were being offered for sale to the United States, including this Judicial District.

14. This conclusion was reached through visual inspection of the products listed for sale on the Defendant Internet Stores, as well as subsequent purchases of at least a portion of those products, where we confirmed:

    a. The Infringing Products are copycat versions of the GENIE-S products and likewise improperly utilize the technology of and inventions claimed in at least a portion of the GENIE-S Patents;

    b. Each Defendant Internet Store accepts payment in U.S. Dollars;

    c. We attempted to initiate the purchase process of an Infringing Product from each of the Defendant Internet Stores, and each Defendant allows products to be shipped to the Southern District of Florida.

15. True and correct copies of screenshot printouts from the Defendant Internet Stores, as well as pages confirming the ability to order and ship Infringing Products to Florida, are collectively attached as **Exhibit 2**. More specifically, Exhibit 2 also contains proof of orders placed and accepted by numerous Defendant Internet Stores for the sale of Infringing Products to the Southern District of Florida.

16. We also confirmed that Defendants' seller names (identified in Schedule A to the Motion for TRO) are not associated with any registered business. Moreover, most Defendants fail

to disclose accurate and complete contact information on the Marketplace Platforms.

17. To the best of our knowledge, Defendants and their websites do not conduct business with GENIE-S and do not have the right or authority to use the GENIE-S Patents for any reason. We have no reason to believe that any of the Defendants are authorized resellers of any genuine GENIE-S Products.

18. Upon information and belief, defendants like the Defendants in this case regularly rely on and use the email addresses that the Defendants provide to the Marketplace Platforms and other third-party payment processors in order to communicate concerning monies received through the Defendant Internet Stores. Thus, obtaining such email addresses from the Marketplace Platforms and third-party payment processors is often the fastest and most direct way to get into contact with individuals and entities like the Defendants that are engaged in the sale of Infringing Products.

19. Upon information and belief, Defendants typically facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine GENIE-S Products. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, Western Union, Amazon, eBay and PayPal.

20. The Defendant Internet Stores often include images and design elements that make it very difficult for consumers to distinguish such infringing sites from an authorized website. Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos.

21. GENIE-S has not licensed or authorized Defendants to use the GENIE-S Patents, and none of the Defendants are authorized retailers of genuine GENIE-S Products.

22. Upon information and belief, Defendants also typically deceive unknowing consumers by utilizing the GENIE-S Patents without authorization within the content of their websites (including by advertising the Infringing Products) in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for GENIE-S Products. Additionally, Defendants typically use other unauthorized search engine optimization ("SEO") tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for genuine GENIE-S Products. Further, Defendants typically utilize similar illegitimate SEO tactics to propel new domain names to the top of search results after others are shut down.

23. Upon information and belief, Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores. For example, many of Defendants' names and physical addresses used to register the Defendant Internet Stores are incomplete, contain randomly typed letters, or fail to include cities or states. Other Defendant Internet Stores use privacy services that conceal the owners' identities and contact information. Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Motion for TRO, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities and the full scope and interworking of their massive infringement operation, and to avoid being shut down.

24. Even though Defendants operate under multiple fictitious names, there are

numerous similarities among the Defendant Internet Stores. For example, many of the Defendant websites have virtually identical layouts, even though different aliases were used to register the respective domain names. In addition, Infringing Products for sale in the Defendant Internet Stores bear similar irregularities and indicia of being infringing to one another, suggesting that the Infringing Products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. The Defendant Internet Stores also include other notable common features including use of the same domain name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, user-defined variables, domain redirection, lack of contact information, identically or similarly priced similar hosting services, similar name servers, and the use of the same text and images.

    25. In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online infringers, use a variety of other common tactics to evade enforcement efforts. For example, infringers like Defendants will often register new domain names or online marketplace accounts under new aliases once they receive notice of a lawsuit. Infringers also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring take down demands sent by brand owners. Infringers also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.

    26. Based on my experience in investigating Infringing Products, including the instant investigation, infringers such as Defendants typically operate multiple credit card merchant accounts as well as Amazon, eBay, PayPal, and other third-party payment processing accounts behind layers of payment gateways so that they can continue operation in spite of GENIE-S'

enforcement efforts. Furthermore, Defendants typically maintain off-shore bank accounts and regularly move funds from their Amazon, eBay, PayPal, and other third-party payment processing accounts to off-shore bank accounts outside the jurisdiction of this Court.

27. Monetary damages alone cannot adequately compensate GENIE-S for ongoing infringement because monetary damages fail to address the loss of control of and damage to GENIE-S' reputation and goodwill. Furthermore, monetary damages are difficult, if not impossible, to completely ascertain due to the inability to fully quantify the monetary damage caused to GENIE-S' reputation and goodwill by acts of infringement.

28. GENIE-S' goodwill and reputation are irreparably damaged when the GENIE-S Patents are used in respect of goods not authorized, produced, or manufactured by GENIE-S. Moreover, consumer brand confidence is damaged, which can result in a loss of future sales and market share. The extent of harm to GENIE-S' reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

29. GENIE-S is further irreparably harmed by the unauthorized use of the GENIE-S Patents because the sellers of the Infringing Products take away GENIE-S' ability to control the nature and quality of products utilizing the technology of and inventions claimed in the GENIE-S Patents. Loss of quality control over goods comprising the Infringing Products and, in turn, loss of control over our reputation is neither calculable nor precisely compensable.

30. The sale of Infringing Products causes consumer confusion, which weakens GENIE-S' credibility, brand recognition, and reputation. Consumers who mistakenly believe that the Infringing Products they have purchased originated from GENIE-S will come to believe that GENIE-S offers low-quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with genuine GENIE-S Products, resulting in a loss or

undermining of GENIE-S' reputation and goodwill.

31.   GENIE-S is further irreparably damaged due to a loss of exclusivity. The GENIE-S Products are meant to be exclusive. GENIE-S' extensive marketing and distribution of GENIE-S Products as part of its various marketing activities is aimed at growing and sustaining sales of GENIE-S Products. The GENIE-S Patents signify to consumers that the GENIE-S Products originate from Plaintiff and are manufactured to high quality standards. When Infringers use the GENIE-S Patent registrations in respect of goods without GENIE-S' authorization, the exclusivity of GENIE-S Products, as well as GENIE-S' reputation, is damaged and eroded, resulting in a loss of unquantifiable future sales.

32.   GENIE-S will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued.

I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct.

Executed on February 10, 2025 in __HONG KONG, CHINA_____.

_____
Pamela Hui